## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ALLISON ANNE DEVINE,<br>Plaintiff,<br><br>v.<br><br>ANDREW SAUL,<br>Commissioner of Social Security Administration,<br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) | **CIVIL ACTION<br>NO. 19-40060-TSH** |

## REPORT AND RECOMMENDATION

**November 12, 2020**

Hennessy, M.J.

The Plaintiff, Allison Anne Devine, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying her Disability Insurance Benefits ("DIB"), or, in the alternative, remand to the Administrative Law Judge ("ALJ"). (Docket #14). The Commissioner seeks an order affirming his decision. (Docket #18).

By Order of Reference dated October 11, 2019, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #21), this matter was referred to me for a Report and Recommendation on these two motions which are now ripe for adjudication.

For the reasons that follow, I RECOMMEND that Devine's Motion to Reverse (Docket #14) be **ALLOWED** and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket #18) be **DENIED**.

I.      BACKGROUND

A.      Procedural History

Devine filed an application for DIB on March 3, 2016, alleging that she had been disabled since March 1, 2015.  (Tr. 267).  The application was denied initially and on reconsideration.  (Tr. 144-46; 155-57).  Following a May 10, 2018 hearing, the ALJ rendered a decision unfavorable to Devine on July 18, 2018.  (Tr. 9-25).

The ALJ found that Devine had not been disabled from March 1, 2015, through the date of the decision.  (Tr. 24).  On February 20, 2019, the Appeals Council denied Devine's request for administrative review, making the ALJ's decision final and ripe for judicial review.  (Tr. 1-3). Having timely pursued and exhausted her administrative remedies before the Commissioner, Devine filed a complaint in this Court on April 25, 2019, pursuant to 42 U.S.C. § 405(g).  (Docket #1).  Devine filed the motion for reversal or remand on July 30, 2019, (Docket #14), and the Commissioner filed a cross-motion on September 16, 2019, (Docket #18).  On September 26, 2019, Devine filed a reply to the Commissioner's motion.  (Docket #20).

B.      Personal History

At the time that she claims she became disabled, Devine was twenty-five years old.  (Tr. 258).  She graduated high school and completed two years of college.  (Tr. 333).  Devine is married and has three children.  (Tr. 45).  Her driver's license is suspended, reportedly because she was deemed a "habitual offender" for hitting a parked car and getting a ticket in the same week. (Tr. 47, 73).

Devine was last employed in June 2015 as a part-time cashier at a grocery store.  (Tr. 48-49).  Her employment there lasted for a month-and-a-half until she had to leave because of her

back pain.  (Id.).  Devine has previously worked as a guest service assistant and as a stocker as well as a waitress on weekends.  (Tr. 52, 333).

C.     Medical History

On May 7, 2013, Devine presented to the Lowell General Hospital with severe back and bilateral leg pain and difficulty voiding.  (Tr. 443).  An MRI showed a L4-5 herniation with underlying stenosis.  (Id.).  Dr. Mark Lapp then performed an emergency hemi-laminectomy, lateral recess decompression foraminotomy and discectomy.  (Id.).  Several days after the surgery, Devine was experiencing increased pain and fell in the shower. (Tr. 712). At her six-week follow-up appointment, Devine stated she had made marked improvement in her back pain, but still had right leg pain. (Tr. 440). At this point, Devine had returned to work with restrictions. (Id.).

On March 31, 2015, Devine visited her primary care physician's office at Greater Lowell Medical Group where she saw nurse practitioner Robin Thompkins ("NP Thompkins") for a routine physical examination and reported that she was still having "issues with [her] back". . . "some days are 'worse than others.'" (Tr. 497).  She had no joint pain or leg tenderness, was alert, oriented, and pleasant, and exhibited "no acute distress."  (Tr. 498).  For her back pain, NP Thompkins prescribed nortriptyline and continued her on Tramadol and Cyclobenzaprine.  (Id.)

On July 7, 2015, Devine was seen by NP Thompkins after experiencing four days of increased lower back pain.  (Tr. 495).  Devine reported that the nortriptyline was giving her minimal relief and expressed feeling "depressed with dealing with chronic back pain."  (Id.).  NP Thompkins observed that Devine appeared to be "in distress" and "has to stand and move about the room due to pain."  (Id.).  NP Thompkins started Devine on Norco and Cymbalta for her back pain and continued her on Tramadol as needed.  (Id.).

On August 1, 2015, Devine presented at the Lowell General Hospital emergency room complaining that she was "having really bad back pain." (Tr. 561). Devine reported that she experienced chronic back pain but that it had worsened in the past three days. (Id). Movement such as walking and bending over exacerbated the pain, while nothing relieved it. (Tr. 562). Devine was given morphine which gave her some improvement and was discharged with a diagnosis of sciatica and a prescription for Percocet, prednisone, and Valium. (Tr. 568).

On August 4, 2015, Devine followed up with NP Thompkins. (Tr. 493). Devine reported feeling better following her emergency room visit. (Id.). NP Thompkins increased Devine's nortriptyline for chronic back pain and continued her on Valium. (Id.). NP Thompkins noted Devine's general appearance was "much improved since last visit." (Id.).

On August 7, 2015, Devine saw Dr. Katharine Cronk at New England Neurologic and reported back pain and leg pain that switched from right to left. (Tr. 468). She measured the pain at a 5-6 level, but said it could rise to a 9, with the back pain less severe than the leg pain. (Id.). Dr. Cronk attributed her pain to a "[p]ersistent posterior disc bulge and inferiorly directed central disc extrusion and prominent bilateral foraminal bulges at this level, which may contact the descending left L5 nerve roots." (Tr. 469). Dr. Cronk prescribed Devine Gabapentin and physical therapy. (Id.). Dr. Cronk recommended a lumbar injection and an electromyography. (Id.). An electromyography showing normal muscle functioning was completed on August 18, 2015. (Tr. 470).

On August 9, 2015, Devine presented to Lowell General Hospital complaining of sharp back pain and alternating pain between her right and left legs, causing urinary retention. (Tr. 450, 453). She reported the back pain as greater than the leg pain. (Tr. 450). An MRI showed "a small central L3-L4 disk protrusion with mild-to-moderate central stenosis, L4-5 central disc herniation

with annular tear causing mild-to-moderate central stenosis." (Tr. 458). Dr. Novicki saw Devine for a neurology consult in which she exhibited "[p]ain to palpation of lumbar spine throughout." (Id.). Strength testing revealed "3/5 hip flexor, equal bilaterally, 1/5 to 2/5 with all planes of foot motion with diffuse lower extremity giveway." (Id.). Dr. Novicki noted that the "[e]ntirety of [Devine's] symptoms were not well explained by MRI findings." (Id.). Devine left against medical advice on August 10, 2015, (Tr. 450), claiming that she did so because they wanted to do physical therapy and felt she could "do that at home," (Tr. 491).

Several days later, on August 12, 2015, Devine followed up with NP Thompkins. (Tr. 491). Devine stated that she felt like she was going "downhill" and reported that she cannot "do stairs" and needs help getting in and out of the shower. (Id.). Devine noted that her pain was in her back and radiating down both legs and characterized the pain as an eight out of ten. (Id.). She was unable to do the straight leg raise or walk on heels or toes due to discomfort. (Id.).

On August 24, 2015, Devine saw Dr. Michael Connelly at New England Neurologic for a lumbar injection at Dr. Cronk's recommendation. (Tr. 465-66). Devine reported her worsening back pain had left her with the inability to sit for more than 30 minutes, inability to do no more than light housekeeping, and that standing and walking caused pain. (Tr. 465).

On September 30, 2015 Devine was seen again by NP Thompkins. (Tr. 489). Devine reported that she was continuing physical therapy and described her pain as a 6 out of 10. (Id.). Devine stated that she takes care of her children and is able to function more with them, but the pain increases at night after she does "stuff" during the day. (Id.). Devine also underwent a depression screening, where her score was zero. (Id.). On examination, NP Thompkins noted that Devine appeared very uncomfortable and was shifting her weight on her seat. (Id.). Devine was

unable to do a straight leg raise or walk on heels and toes due to discomfort.  (Id.).  NP Thompkins increased the Gabapentin dosage and restarted Devine on Percocet and Trazadone.  (Id.).

On December 23, 2015, Devine was seen by NP Thompkins for a three-month follow-up appointment and reported severe headaches, insomnia, and back pain attributed to fibromyalgia. (Tr. 687).  NP Thompkins observed that Devine appeared in mild distress and got up slowly from a seated position, but "appear[ed] better since last visit." (Tr. 688).   Devine described the fibromyalgia pain at 5-6 out of 10 with most of the pain in her legs, arms, and fingers.  (Tr. 687). NP Thompkins opined that Devine met the criteria for fibromyalgia.  (Id.).  Devine expressed that the injections and nortriptyline did not help, but the Gabapentin did help.  (Id.).  NP Thompkins discussed with Devine that she "needs to actively participate in her chronic pain/back care program/seek out alternative therapies," and "[l]ong term opioid use for chronic pain/fibromyalgia is not ideal." (Tr. 688).  NP Thompkins prescribed Lyrica for her fibromyalgia and instructed her to stop nortriptyline.  (Tr. 689).

On February 28, 2016, Devine presented at the Lowell General Hospital emergency room with low back pain radiating down her legs.  (Tr. 643).  The emergency room doctor treated Devine with pain medications and discharged her in an improved condition with a diagnosis of chronic low back pain.  (Tr. 647).

On March 16, 2016, Devine returned to Dr. Lapp for a consultation for her chronic back and leg pain.  (Tr. 737).  Devine stated that the Percocet, Tramadol, as well as the Gabapentin and Amitriptyline were not giving her much relief and she was currently not working due to the pain. (Id.).  An MRI taken showed degenerative changes at L4-L5 with a central annular tear and a recurrent central bulge, which was in the position to irritate the L5 nerve root, likely causing her

pain.  (Tr. 739).  Dr. Lapp recommended a lumbar injection, (id.), which was administered by Dr. Atul Bhat on April 26, 2016, (Tr. 723).

On March 27, 2016, Devine again visited Lowell General Hospital complaining of severe lower back pain.  (Tr. 616).  Devine presented in the emergency room crying, but after pain medications were given, she was observed in no distress and able to walk on her own to the restroom.  (Id.).  During this visit, Devine refused to be admitted and was aggressive with hospital nurses and staff.  (Id.).  Devine was prescribed a walker during this visit. (Id.).

In a follow up appointment with Dr. Lapp on May 16, 2016, Devine stated that she had several days of improvement following the April 26 lumbar injection, but the pain in her lower back and legs had since returned.  (Tr. 732).  Devine stated her interest in undergoing another surgery as her pain was interfering with daily activities.  (Id.).  At this point, Devine reported no depression or alcohol abuse.  (Tr. 725).

Devine followed up with Dr. Lapp on July 20, 2016.  (Tr. 791).  Devine indicated that she was continuing to experience lower back pain and bilateral leg pain, more so in the right leg.  (Id.).  Devine stated she had quit smoking per the recommendation of Dr. Lapp during their previous meeting, and indicated she wanted to go forward with another surgery, seeing as physical therapy, medication, and other interventional treatments had not helped with the pain.  (Tr. 791, 793-94).

From July through October of 2016, Devine was seen regularly by Dr. Farha Durathun at the Greater Lowell Medical Group.  (Tr. 890-900).  In July, she reported severe back pain which was causing difficulty sleeping.  (Tr. 890). During the examination, Dr. Durathun noted that Devine was "changing position constantly," had "paralumbar tenderness bilaterally," but "no lumbar spinous process tenderness."  (Id.).  She prescribed Hydrocodone and Oxazepam for Devine's back pain.  (Id.).  In August 2016, Dr. Durathun evaluated Devine's back pain and found

no neurological symptoms, "exam benign." (Tr. 893). In September and October 2016, Devine presented to Dr. Durathun with "no complaints" and she noted that the back pain was "controlled on the present regime." (Tr. 898, 900). During these visits, she was prescribed medication for hypertension, insomnia, migraines, and back pain, (Tr. 893, 896, 898, 900).

On February 17, 2017, Dr Lapp performed a second back surgery, a complete discectomy and fusion. (Tr. 800-802). After this surgery, Devine reported relief of her radicular leg pain but that she continued to experience low back pain much of which appears to be myofascial in nature. (Tr. 806, 811, 816). At her three-month post-operative appointment on May 22, 2017, Dr. Lapp noted Devine continued to improve slowly; however, she still required narcotics for residual pain. (Tr. 816).

At a visit with NP Thompkins on May 1, 2017, Devine indicated she was still experiencing back pain, was concerned about weaning off narcotics, and was prescribed more Percocet. (Tr. 911). She also indicated wanting to restart a medication for anxiety, which was prescribed, but declined to see a psychologist or counselor. (Id.). On July 5, 2017, Devine visited NP Thompkins and reported that her back pain is usually a 5 but is now hitting an 8 or 9, stating that some days she "can't get out of bed," cannot complete "basic housework," and is grumpy with her children. (Tr. 913). Devine reported muscle pain, which was "tight, contracted, stiff" and back pain, which was "sharp, shooting, burning." (Id.). NP Thompkins noted her concern that "opioid therapy is not the ideal choice" for chronic back pain and suggested Devine start physical therapy or acupuncture. (Tr. 914). NP Thompkins prescribed Devine more Percocet and Soma, and started her on Prozac for anxiety, as well as refilling other medications for migraines, hypertension, and insomnia. (Tr. 914-15). On October 25, 2017, Devine visited NP Thompkins for sore throat and ear pain, and also reported difficulty sleeping. (Tr. 916). NP Thompkins and Devine again

discussed cutting down on medications.  (Id.).  NP Thompkins increased the dosage of Devine's fibromyalgia medication, Lyrica, cut out Soma, and continued her on Prozac, Percocet, and Ambien.  (Tr. 916-17).

On January 8, 2018, Devine presented to the Carney Hospital emergency room in Dorchester reporting worsening depression and anxiety and fleeting suicidal thoughts.  (Tr. 924). Devine had previously attempted suicide by overdose at the age of 18, resulting in her being on life support for three days.  (Tr. 924).  Devine was transferred to the Cambridge/Somerville Community Crisis Stabilization Unit where she actively participated in group therapy, and was "pleasant and cooperative" with staff, and stable upon discharge four days later.  (Tr. 921).  She ambulated without assistance but reported being "in a lot of pain."  (Tr. 923, 928).  Devine's primary diagnosis was Bipolar I, and the secondary diagnosis was post-traumatic stress disorder. (Tr. 930).

On February 7, 2018, Devine began to attend a partial psychiatric hospitalization program at the Cambridge/Somerville Community Crisis Stabilization Unit where she attended group therapy and saw psychiatrist Dr. Jha three times to assess her bipolar disorder.  (Tr. 980-86).  At each encounter, Dr. Jha reported that Devine appeared "bright," "pleasant," and "talkative."  (Tr. 981, 984, 986).  On February 7, 2018, Devine described "her lows currently as feeling extremely sad," "helpless," and reported an inability to get out of bed.  (Tr. 980).  While Dr. Jha reported that Devine has a history of mania, she denied experiencing any current symptoms.  (Id.).  Devine stated that she used cannabis on an occasional basis, but never alcohol or non-prescribed drugs. (Tr. 981).  Dr. Jha concluded that Devine was not a harm to herself or others.  (Id.).  Dr. Jha started Devine on Risperdal for bipolar disorder and Ativan for her anxiety.  (Tr. 983).  At her final appointment with Dr. Jha on February 12, 2018, Devine reported she was feeling a lot better after

attending the group sessions and denied having signs of depression, but still reported having some anxiety.  (Tr. 985).

At the same time, Devine began seeing psychiatric-mental health nurse practitioner Elizabeth Gallagher ("NP Gallagher").  In her initial psychiatric evaluation on January 18, 2018, NP Gallagher noted that Devine behaved anxiously, had a depressed mood, limited judgment, but a "gross/intact" memory and "fair" insight.  (Tr. 995).  Devine reported having suicidal thoughts without current intent and alternating periods of mania and depression.  (Id.).  On February 1, 2018, Devine reported to NP Gallagher that she was still dealing with depression and anxiety and only getting two or three hours of sleep each night.  (Tr. 998).  NP Gallagher noted Devine was ambulating "without difficulty" and had a steady gait.  (Tr. 10001).  Devine denied having difficulty performing her activities of daily living.  (Id.).

On March 5, 2018, Devine reported to NP Gallagher that she had a high level of anxiety going into public places and dealing with a lot of people, and that she was eating and sleeping well and able to take care of herself and her family.  (Tr. 1004).  NP Gallagher noted that Devine was pleasant and talkative during the appointment, appeared alert with fair judgment, attention, and insight, and that Devine reported she was ambulating without difficulty.  (Id.).  On March 30, 2018, Devine had another MRI which showed at L3-L4 a mild disc desiccation and loss of disc height, a small broad-based posterior disc bulge, and moderate central canal stenosis, which had "slightly worsened" since Devine's last MRI in March 2016 and was now characterized as "moderate" in severity.  (Tr. 966-68).  At L4-L5, the MRI showed enhancing scar tissue abutting the L5 nerve root, no residual posterior disc abnormality, and no central canal stenosis or foraminal stenosis.  (Tr. 967).  There was no evidence of recurrent disc herniations.  (Id.).

On April 24, 2018, NP Gallagher completed a Mental Impairment Questionnaire on behalf of Devine, in the format of a checklist, co-signed by Dr. Jha. (Tr. 971-77). NP Gallagher diagnosed Devine with bipolar and anxiety disorders and assigned her a global assessment of functioning ("GAF") in the range of between 51 and 60.[1] (Tr. 971). NP Gallagher noted that, as a side effect of her medications, Devine experienced high anxiety in public spaces and seizure activity. (Tr. 971). She noted clinical findings included panic symptoms and periods of poor concentration, and Devine's prognosis was a lifetime condition. (Id.). On a checklist, NP Gallagher indicated that Devine had a limited, but satisfactory ability to: remember work-like procedures; understand, remember, and carry out detailed instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a constant pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; set realistic goals or make plans independently of others; deal with stress of semi-skilled and skilled work; interact appropriately with the general public; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. (Tr. 973-74). NP Gallagher noted that Devine had a seriously limited, but not precluded ability to: maintain attention for two-hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware

---

[1] The GAF Scale is used for reporting a clinician's judgment of the individual's overall level of functioning and concerns psychological, social, and occupational functioning. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed., text revision 2000). GAF scores in the 51-60 range indicate "moderate" symptoms or difficulty in functioning. Id. at 34.

of normal hazards and take appropriate precautions; travel in unfamiliar places, and use public transportation. (Id.). Evaluating Devine's functional limitations, NP Gallagher indicated in checklist format that Devine had marked restriction of activities of daily living; marked difficulties in maintaining concentration, persistence, or pace; moderate difficulties in maintaining social functioning; and had experienced three episodes of decompensation within a twelve month period, each of which lasted at least two weeks. (Tr. 975). NP Gallagher checked off that Devine had a "[m]edically documented history of a chronic mental, schizophrenic, etc., or affective disorder of at least 2 years' duration that has caused more than a minimal limitation or ability to do any basic work activity" and that Devine had "[a]n anxiety related disorder and complete inability to function independently outside the area of one's home." (Id.). NP Gallagher indicated that she anticipated Devine's absence from work to exceed four days per month, and for Devine's impairments to last at least twelve months. (Tr. 976). NP Gallagher noted that Devine was currently prescribed Ativan, Lithium, Topamax, metoprolol, Lyrica, zolpidem tartrate, and Risperdal. (Tr. 971).

On April 27, 2018, Devine reported to NP Gallagher that she was experiencing sadness and struggling to get through the day. (Tr. 1007).

D.      State Agency Opinions

1. Physical

On October 22, 2015, Dr. Robin Tapper, state agency medical consultant, reviewed the evidence on the record and opined that Devine's "spine disorders" constitute a severe physical impairment. (Tr. 91-99). Dr. Tapper opined that Devine could lift and/or carry twenty pounds occasionally and ten pounds frequently, could stand/walk for a total of six hours in an eight-hour workday, and could sit for a total of six hours in an eight-hour workday. (Tr. 96-97). Dr. Tapper

determined that Devine could occasionally climb ramps, stairs, ladders, ropes, scaffolds and could occasionally balance, stoop, kneel, crouch, and crawl.  (Tr. 97).

On April 25, 2016, Dr. Uma Chelvan, state agency medical consultant, reviewed the record and opined that Devine had two severe physical impairments: dysfunction of major joints and essential hypertension.  (Tr. 105).  Dr. Chelvan determined that Devine could lift and/or carry twenty pounds occasionally and ten pounds frequently, could stand/walk for a total of six hours in an eight-hour workday, and could sit for a total of six hours in an eight-hour workday.  (Tr. 106-07).  Dr. Chelvan found that Devine could occasionally climb ramps, stairs, ladders, ropes, and scaffolds and could frequently balance, stoop, kneel, crouch, and crawl.  (Tr. 107).  Dr. Ludmila Perel reviewed the record on August 2, 2016.  (Tr. 118-21).  She reduced Devine's sitting to a total of four hours and reduced Devine's ability to stoop to occasionally.  (Tr. 119-20).  Otherwise, her assessment was the same as that of Dr. Chelvan.

2.  Mental

On April 26, 2016, Dr. Joan Kellerman, a state agency psychological consultant, reviewed the record and concluded that Devine's activities of daily living did not reveal difficulties due to depression and that further psychological development was not necessary.  (Tr. 105).  On August 4, 2016, Dr. S. Fischer, a state agency psychological consultant, completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique on Devine's behalf.  (Tr. 118).  Dr. Fischer opined that Devine had non-severe affective disorders.  (Tr. 117).  Dr. Fischer stated Devine had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no repeated extended episodes of decompensation.  (Id.).

E.      Hearing Testimony

        1. Claimant Testimony

A hearing before an ALJ was held on May 10, 2018, where Devine, represented by an attorney, and a vocational expert gave testimony.  (Tr. 33-90).

 Devine testified to having three children, ages eleven, ten, and three.  (Tr. 45).  The older two children wake themselves up in the morning and walk about a half mile to the bus stop.  (Tr. 45-46).  Devine testified that she moved the family to Worcester from Dorchester in April 2018 to be closer to her family.  (Tr. 76).  Devine stated that her mother now helps with the three year- old, picking him up three to four days a week and bringing him to her house.  (Tr. 46).  When the three year-old is not with Devine's mother, he is at home with Devine.  (Id.).  Before their move, Devine's husband was working the night shift and could be at the house to help Devine during the day.  (Tr. 77).  At the time of the hearing, Devine's husband worked from eight to five.  (Tr. 46).

Devine testified that she worked at Target for five and a half years as a Guest Service Assistant.  (Tr. 49).  Prior to 2014, Devine worked at Target full-time and waitressed on the weekends.  (Tr. 49-50, 52).  Following her back surgery, Devine attempted to return to Target full-time but was not able to keep up.  (Tr. 51).  Devine stated that she was then put in an office job, working three-hour shifts with the ability to sit/stand at will.  (Tr. 50-51).  However, she ended up quitting because she got hot-tempered on her pain medication.  (Tr. 50).  Devine stated that she then worked as a part-time seasonal employee at Home Depot in 2015.  (Tr. 52).  Devine last worked in June 2015 as a part-time cashier at Market Basket but testified that she left after a month and a half because her back pain put her back in the hospital. (Tr. 48-49).  Devine has not looked for work since she left Market Basket, reasoning "I felt like almost as if, like, it just doesn't make

any sense to, because I'm going to start a job for a month and a half to quit because I'm not physically able to do it, or because I have a breakdown and can't get out of bed," (Tr. 52).

Devine stated that she experienced some relief in leg pain after the second fusion, but the pain returned after a few months. (Tr. 53-54). She testified to having pain in both her legs prior to surgery, but now has it on her right side only. (Tr. 54). Devine describes the pain as constant and located in her hip and front pelvic area. (Tr. 55). She testified that she also has bursitis in her hip and receives a shot about once a year for that condition. (Tr. 60). Devine testified that she had a seizure on Thanksgiving 2016 and one in January 2017. (Tr. 58-59). She stated that she also has experienced migraines, but they have improved with medication. (Tr. 59-60).

Devine testified that she usually spends her days pacing the floor or laying on the couch, although, staying in one position for too long is painful. (Tr. 56). Devine stated that she has taken oxycodone on and off for three years. (Id.). She testified that her pain level never goes below a 5, (id.), but she is able to do some household work, including making the bed and helping her older children fold clothes, but is not able to cook, (Tr. 57). She stated that she is able to care for her personal hygiene, but sometimes needs help getting pants on. (Tr. 60). Devine testified that her husband manages her medications. (Tr. 69).

Devine testified that she walks with a waddle and cannot walk a half hour without stopping. (Tr. 61). She had a walker, but stated that she got rid of it because it was embarrassing. (Tr. 62). She testified that she cannot stand in one place. (Id.). Devine described needing to shift her weight while sitting to alleviate pressure on one side or another, (Tr. 61), but was able to sit at the hearing for an hour, (Tr. 80).

Devine testified that during Christmas 2017, she became depressed. (Tr. 62-63). She checked herself into a hospital for a week and then did a partial hospitalization program for two

weeks.  (Tr. 63).  Devine stated that right before Christmas, she had a manic episode where she left her husband and children for a week and did not tell anyone where she was going.  (Tr. 63-66). Devine spent this time partying with friends and random people.  (Tr. 64).  Devine's stated reasoning for this manic episode was that "I just didn't want to deal with my life."  (Tr. 66).  However, she testified that it was "a one-time thing," and she would never characterize herself as a habitual partier.  (Tr. 68).  She denied abusing either alcohol or drugs and stated that she stopped smoking cannabis after her hospitalization.  (Tr. 66).

Devine testified that she still struggles with depression.  (Tr. 63).  She stated that she is tired daily and sometimes suffers from blurred vision as a side effect of the mediations that she takes.  (Tr. 47).  Devine attends psychotherapy one to two times a month, paying out-of-pocket $150 for each visit.  (Tr. 69).

At the conclusion of her testimony, Devine communicated that she wants to go in the right direction, to be active in her family, and would consider another back surgery as a means to those ends.  (Tr. 72-73).

2.  Vocational Expert Testimony

Following Devine's testimony, the ALJ asked a vocational expert for her assessment on the skill and exertional levels of Devine's work history.  (Tr. 82).  The ALJ asked the vocational expert to consider:

> a hypothetical claimant [of Devine's age, education, and work experience] capable of performing a full range of light work, but that the individual is able to stretch or change positions, such as the freedom of a sit/stand option throughout the day at their discretion and for their comfort.  They will be off task up to but not in excess of 10% of each day in addition to regular breaks, and absent up to one day per month.

(Tr. 83).  The vocational expert responded that the hypothetical individual could not perform past work, but could perform work as a retail marker consisting of 189,000 jobs nationally, as an order

16

caller consisting of 19,000 jobs nationally, and as a parking lot cashier consisting of 39,000 jobs nationally.  (Tr. 83-84).  The vocational expert testified that if the hypothetical individual's limitations were kept the same but if the exertional capacity was reduced to a full range of sedentary work, the hypothetical individual could not perform past work, but could perform work as an addressing clerk consisting of 13,000 jobs nationally and as a document preparer consisting of 29,000 jobs nationally.  (Tr. 84-85).  The vocational expert further testified that limiting the individual to only occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; balancing; stooping; kneeling; crouching; and crawling would not change her findings with respect to either hypothetical.  (Tr. 86).  The vocational expert also testified that an employer would not tolerate the hypothetical individual being off-task in excess of 10% or absent more than one day a month. (Id.).

F.     Administrative Decision

 In assessing Devine's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits.  See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether he is "doing substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is doing substantial gainful activity, the ALJ will find that he is not disabled.  Id.  The ALJ found that Devine had not engaged in substantial gainful activity since March 1, 2015, the alleged onset date.  (Tr. 15).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe."  20 C.F.R. § 404.1520(a)(4)(ii).  The ALJ determined that Devine had the following severe impairments:

"degenerative disc disease, migraines with aura but without status migrainosis, unspecified seizure disorder, insomnia, depression and anxiety."  (Tr. 15).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled.  Id.  The ALJ found that Devine did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment.  (Tr. 16).

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must determine the claimant's RFC.  20 C.F.R. § 404.1520(e).  An individual's RFC is his ability to do physical and mental work activities on a sustained basis, despite limitations from his impairments.  20 C.F.R. § 404.1545(a)(1).  Here, the ALJ found:

> [Devine] has the residual functional capacity to perform light work[2] as defined in 20 CFR 404.1567(b) except she must be able to stretch or change positions, such as the freedom of a sit/stand option throughout the day at her discretion and for her comfort.  The claimant will be off task up to, but not in excess of 10% of each day in addition to regular breaks and will be absent up to one day per month.

---

[2] "Light" work:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

18

(Tr. 18).  The ALJ determined that Devine's RFC precluded a return to any past relevant work. (Tr. 23).

At the fifth step, the ALJ asks whether the claimant's impairments prevent her from performing other work found in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).  The ALJ determined that, based upon her RFC and the testimony of the vocational expert, jobs exist in significant numbers in the national economy that Devine can perform.  (Tr. 23).  Accordingly, the ALJ found that Devine was not disabled at any time from March 1, 2015, through July 18, 2018. (Tr. 24).

## II.    STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).  The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence.  Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003). Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act.  Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process.  Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This includes the burden of establishing her RFC.  20 C.F.R. § 404.1512(c).  At step five, the Commissioner has the burden of identifying specific jobs in the national economy that the plaintiff can perform.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

III.     ANALYSIS

Devine presents four arguments on appeal. First, she argues that the ALJ failed to consider critical evidence and based her conclusion on her own non-expert opinions "[i]n a classic example of cherry picking."  (Docket #15 at 10-12).   Second, Devine argues that the opinion of her psychiatrist and therapist were not adequately considered.  (Docket #15 at 13-15).  Third, Devine contends that the ALJ's conclusions and RFC findings are not supported by medical opinion. (Docket #15 at 16-17).  Fourth, Devine asserts that the ALJ provided an insufficient explanation for why she did not accept Devine's description of her symptoms as credible.  (Docket #15 at 17-19).  Each argument will be addressed in turn.

**A. Consideration of Evidence**

The ALJ concluded that, "[w]hile the medical records and opinion evidence support the presence of clinical abnormalities that restrict the claimant's functioning, they do not support the existence of work-related limitations that would preclude the performance of substantial gainful activity[.]"  (Tr. 20).  Devine argues that the ALJ failed to consider the "clinical and radiological evidence of [her] deterioration and increase in her relapse of back pain after her spinal surgery in 2013," mischaracterized her physical examinations in 2015, and omitted her struggles with pain

20

from 2015 through her second surgery, including no mention of Devine's 2016 and 2018 MRIs. (Docket #15 at 10-12).   Contrary to Devine's argument, the ALJ appropriately considered the evidence in the record and supportably reconciled discrepancies to arrive at a conclusion supported by substantial evidence.

The ALJ considered Devine's back surgery in 2013, observing that "[p]ost-operative treatment notes showed an improved right sciatica," but Devine had "ongoing subjective complaints" after trying physical therapy and medications.   (Tr. 20).   The ALJ described Devine's August 2015 MRI as showing a "small" central canal herniation at L3-L4 and L4-L5 without clear neural impingement.[3]   (Id.).   The ALJ observed that Devine's treatment notes contained numerous inconsistencies giving as an example Dr. Novicki's conclusion that the "entirety of [her] symptoms [are] not well explained by the [August 2015] MRI findings."   (Id.).   The ALJ also pointed to two occasions where Devine presented to the emergency room with severe pain, but in one instance left against medical advice and in another was observed in no distress and ambulating without assistance.   (Id.).   The ALJ also noted that two months after her February 17, 2017 surgery, progress notes documented Devine's report of being able to engage in light household chores and that Devine denied numbness or weakness and endorsed continued relief of symptoms of radicular leg pain three months post-surgery.[4]   (Tr. 20, 811, 816).

---

[3] Devine asserts that the ALJ altered Dr. Lapp's description of the March 2016 MRI, replacing Dr. Lapp's finding that it demonstrated a "potential irritation of the L5 nerve" with a remark that he did not make – that it was "without clear neural impingement."   (Docket #20 at 2 n.1).   Devine is correct that Dr. Lapp did not make that finding with respect to the March 2016 MRI; however, a careful reading of the opinion demonstrates that the ALJ was not describing the March 2016 MRI but was instead accurately describing Dr. Novicki's impressions of the August 2015 MRI.   (See Tr. 20, 458).

[4] Devine asserts that the ALJ mischaracterized her second back surgery by stating, "By May 2016, treatment records indicate the claimant expressed interest in surgical intervention complaining that her low back and leg pain interfered with activities of daily living."   (See Tr. 20; Docket #15 at 12).   Devine argues that the surgery did not take place because she "expressed interest" in it as the ALJ's narrative suggest, but rather because the clinical findings available to her orthopedic surgeon established an objective cause for her pain. (Docket #15 at 12).   However, the Commissioner correctly notes that the ALJ was merely stating what Devine's own doctor documented: "[Devine states that her low

21

The ALJ also noted that Devine's physical examinations had "remained largely unremarkable." (Id.). The ALJ points to an appointment on September 4, 2015 where Dr. Cronk noted Devine was able to walk on toes and heels across the room, had intact sensation on all dermatones on upper and lower extremities, and had normal coordination and a good gait. (Tr. 20, 464). The ALJ also pointed to an August 4, 2015 appointment where NP Tompkins noted Devine was "much improved since [the] last visit" and Devine herself noted she was "feeling better than I ever have." (Tr. 20, 493). The ALJ cited an emergency room visit on March 27, 2016, where physical examination notes indicated a normal range of motion, normal alignment, positive straight leg raises, normal strength, and no swelling or deformity, (Tr. 20, 619), and an emergency room visit on February 28, 2016 where the practitioner noted "straight leg raising" and that Devine was "able to walk on heels and toes," (Tr. 20, 646). The ALJ also cited Dr. Bhat's notes from his appointment with Devine on April 6, 2016 in which he found that Devine stood and walked with good sagittal plane balance, had no appreciable soft tissue tenderness, was able to extend up to neutral but did experience axial back pain on forward flexion at about 35-40 degrees, and that gentle hip movement was quite painless. (Tr. 20, 727). Devine disputes the ALJ's finding that her physical examinations remained largely unremarkable pointing to evidence supporting her reports of back pain including positive straight leg raising tests, pain and limited range of motion, inability to do straight leg raising or heel to toe testing, decreased sensation, and antalgic or irregular gait. (Docket #15 at 11).

When faced with these inconsistencies in the record, the court must leave it to the ALJ to resolve such conflicts. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). Although the record may justify a conclusion in Devine's favor, the Court must affirm

---

back and leg complaints are interfering with her activities of daily living and is interested in surgical intervention." (Tr. 732).

the ALJ's decision where it is supported by substantial evidence.  Id.  Here, a reasonable mind, reviewing the evidence and its inconsistencies summarized above, could accept a conclusion that Devine is capable of "light work" with limitations.

Devine correctly points out that the ALJ did not discuss each piece of evidence in the record; notably, her MRI in March 2016 was not discussed.[5]  Although the ALJ did not expressly mention the March 2016 MRI, she did cite to treatment notes reviewing that study making clear that she considered the results of the MRI.  (Tr. 20, 727).  See NLRB v. Beverly Enterprises-Massachusetts, Inc., 174 F.3d 13, 26 (1st Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); Sousa v. Astrue, 783 F. Supp. 2d 226, 234 (D. Mass. 2011) ("The hearing officer is not required to – nor could he reasonably – discuss every piece of evidence in the record").

### B.   Opinion of NP Gallagher and Dr. Jha

Devine argues that the ALJ improperly weighed the joint opinion of NP Gallagher, her outpatient therapist, and Dr. Jha, her psychiatrist from the day treatment program ("Gallagher/Jha Opinion").[6]  (Docket #15 at 13-15).

A treating physician's opinion as to the nature and severity of a claimant's impairments is entitled to controlling weight if it is consistent with "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  When an ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must consider the following factors to determine what weight to

---

[5] The ALJ also failed to discuss the March 2018 MRI.  That omission will be discussed in Section III.C, infra.

[6] The ALJ attributes the opinion solely to NP Gallagher despite its being co-signed by Dr. Jha.  (Tr. 22, 977).  The undersigned does not find this attribution material as it does not impact the factors the ALJ considered in discounting the weight given the opinion.  That Dr. Jha co-signed the opinion does not make it any less inconsistent internally or with the record as a whole nor does it change the fact that it did not offer support for its conclusions.  Furthermore, Devine's treatment relationship with Dr. Jha was similar in length to her treatment relationship with NP Gallagher.

actually give the opinion: the length, nature, and extent of treatment and the frequency of the examination; supportability of the opinion by evidence; consistency with the record; the specialization of the treating source; and any other relevant factors which support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2)-(6); see Rodriguez Pagan, 819 F.2d at 3 (holding that ALJ was not required to assign treating physicians' opinions controlling weight because the opinions were based excessively on claimant's subjective complaints, rather than on objective medical findings).  "When a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply."  Shaw v. Sec'y of Health & Human Servs., No. 93-2173, 1994 WL 251000, at *3 (1st Cir. June 9, 1994); see Leahy v. Raytheon, 315 F.3d 11, 21 (1st Cir. 2002) ("when other evidence sufficiently contradicts the view of a treating physician, that view appropriately may be rejected").

Here, the ALJ afforded the Gallagher/Jha opinion "some weight" and adequately explained three reasons for doing so: (1) it was inconsistent with the medical evidence of record; (2) it was in a check-list format that did not offer support for its conclusions; and (3) it "lack[ed] a longitudinal perspective" on Devine's condition.  (Tr. 22).

The ALJ found that the severity of the Gallagher/Jha opinion was "in stark contrast to the objective medical and other evidence," highlighting the opinion's assertion that the evidence conformed to a finding of three episodes of decompensation within the past twelve months, each of at least two weeks duration - an assertion the ALJ supportably found the record did not substantiate.[7]  (Tr. 22).  The ALJ also suggested that the Gallagher/Jha Opinion was internally

---

[7] Devine argues that the ALJ required expert evaluation to determine what the treating source considered evidence of "decompensation" as it is not immediately clear to the layman.  (Docket #20 at 6 n.2).  The undersigned disagrees. Episodes of decompensation were defined in the Questionnaire itself as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace."  (Tr. 975).  The Questionnaire notes that episodes of decompensation "may be demonstrated by an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)."  (Id.).

inconsistent insofar as it opined that Devine had marked restrictions while assessing her a GAF score of between 51 and 60 which is indicative of no more than moderate symptoms.[8]  (Id.).  These inconsistencies provide substantial support for the ALJ's decision to discount the Gallagher/Jha opinion.

In weighing the Gallagher/Jha Opinion, the ALJ also considered the support offered for the opinion's conclusions and decided it was inadequate, partially based on the opinion's check-list format.  (Id.).  Devine argues that the checklist is "a technique the state agency routinely uses to present the specific information from medical sources needed for an RFC finding," and thus should not be discounted.  (Docket #20 at 5).  However, Devine's argument is flawed and shows a misunderstanding of the ALJ's reasoning.  The issue is not the checklist format used by NP Gallagher and Dr. Jha, instead it is the fact that it "includes only conclusions regarding functional limitations without any rationale, justifications or citations to progress notes for those conclusions." (Tr. 22).  See Shields v. Astrue, No. 10-10234-JGD, 2011 U.S. Dist. LEXIS 33606, at *22 (D. Mass. Mar. 30, 2011) (holding that ALJ supportably gave no significant weight to the physician's opinion where it was "conclusory," "overly broad," "not supported by objective findings," and failed to provide a description of the claimant's limitations).  As the ALJ is directed to afford more weight to medical sources that provide "relevant evidence to support a medical opinion, particularly medical signs and laboratory findings," 20 C.F.R. § 404.1527(c)(3), the

---

Such a definition allowed the ALJ to evaluate whether there were in fact three episodes of decompensation within the preceding twelve months.

[8] Devine argues that the single GAF score does not provide a basis to discount the Gallagher/Jha opinion as GAF scores have recently fallen into disfavor as an assessment tool "[d]ue to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed."  (Docket #20 at 7-8 (quoting Kroh v. Colvin, No. 13-CV-01533, 2014 U.S. Dist. LEXIS 122900 at *52 (M.D. Pa. Sept. 4, 2014)).  However, the ALJ did not utilize the GAF score to raise or lower Devine's level of function; instead, she merely pointed to it as evidencing the internal inconsistency of the Gallagher/Jha opinion.

Gallagher/Jha opinion's failure to cite supporting evidence supports the ALJ's decision to afford the opinion less weight.

In assessing the appropriate weight to give the Gallagher/Jha Opinion, the ALJ also considered the length of time that NP Gallagher was treating Devine. (Tr. 22). An ALJ may permissibly discount a medical opinion based on frequency of examination and length of the treatment relationship. See 20 C.F.R. § 404.1527(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source."); Anderson v. Berryhill, 368 F. Supp. 3d 128, 135 (D. Mass. 2019) (stating that brevity of the treatment relationship may be a good reason for not giving the opinion of a treating physician controlling weight). The ALJ appropriately determined that where NP Gallagher had first started treating Devine only months earlier, her opinion was entitled to "some weight but it is greatly undermined in its persuasiveness because Ms. Gallagher lacks a longitudinal perspective on the claimant's condition."[9] (Tr. 22). See Anderson, 368 F. Supp. 3d at 135 ("[N]o more than three visits . . . is a relatively brief treatment relationship").

Devine argues that the ALJ could discount the Gallagher/Jha opinion only if it was contradicted by another medical opinion in the record. However, as the Commissioner accurately points out, the ALJ was required to "weigh the Gallagher/Jha Opinion against the record as a whole, not just against other opinion evidence." (Docket #19 at 14). See 20 C.F.R. § 404.1527(c)(4) ("[T]he more consistent a medical opinion is with the record as a whole, the more

---

[9] The ALJ incorrectly stated that NP Gallagher began treating Devine just two months prior to completing the Mental Impairment Questionnaire. (Tr. 22). However, as correctly noted by the ALJ, NP Gallagher began treating Devine in January 2018 and issued her opinion in April 2018. (Id.). Thus, at the time she issued her opinion, NP Gallagher had been treating Devine for a little over three months and had seen Devine four times, while Dr. Jha had seen Dr. Jha only three times. (Tr. 980-1010).

weight we will give to that medical opinion").  The Gallagher/Jha Opinion did not need to be contradicted by another medical opinion for the ALJ to justify her decision to give it only "some weight," which she did in accordance with the factors outlined in 20 C.F.R. § 404.1527.  See Ferrante v. Astrue, 755 F. Supp. 2d 206, 210 (D. Me. 2010) (rejecting the plaintiff's contention that the ALJ could only discount the diagnosis of an examining physician if the record also contains a "definitive opinion to the contrary").

## C.  RFC Assessment

Devine argues that the ALJ erred in not seeking an expert to evaluate the new evidence in the record post-dating the state agency consultants' reviews, which were rendered in October 2015 and April 2016, (Tr. 91, 105) (physical assessment), and April 2016 and August 2016, (Tr. 105, 117) (mental assessment).  (Docket #15 at 16). It is the law in this Circuit that "[t]he opinion of a non-examining consultant cannot serve as substantial evidence if it is 'based on a significantly incomplete record' and fails to account for a deterioration in the claimant's condition." Ford v. Berryhill, No. 16-11976-FDS, 2017 U.S. Dist. LEXIS 161612, at *30 (D. Mass. Sept. 28, 2017) (quoting Alcantara v. Astrue, 257 F. App'x 333, 334 (1st. Cir. 2007)).  The record is incomplete if new evidence, post-dating the state agency consultant's review, "materially changed the basis for assessing the claimant's limitations." Blakley v. Saul, No. 18-cv-702-LM, 2019 WL 4668020, at *5 (D.N.H. Sept. 29, 2019).  An ALJ can make "common-sense judgments about functional capacity based on medical findings," Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990), but the ALJ cannot interpret "raw medical data" in that determination, which would cause her to "overstep the bounds of a lay person's competence and render a medical judgment," Beyene v. Astrue, 739 F. Supp. 2d 77, 83 (D. Mass. 2010).

Here, the ALJ adopted the state agency consultant Dr. Chelvan's "light work" RFC finding and added limitations in light of this new evidence.[10]  (Tr. 22).  Although the Gallagher/Jha Opinion and the progress notes following Devine's February 2017 surgery were susceptible to a common-sense judgment, the March 2018 MRI was raw medical data which the ALJ, as a layperson, was not qualified to analyze without an expert's review. See Giandomenico v. U.S. Soc. Sec. Admin., Acting Comm'r, No. 16-cv-506-PB, 2017 WL 5484657, at *5 (D.N.H. Nov. 15, 2017) (remanding where evidence post-dating expert review, a pulmonary function test and a CT angioplasty, was "raw data" beyond a layperson's competence).  Bell v. Astrue, No. 11-cv-45-PB, 2012 WL 124841, at *9 (D.N.H. Jan. 17, 2012) (holding that ALJ, as a layperson, could not decide whether lumbar and cervical MRIs post-dating physician's opinion materially changed the record).

The Gallagher/Jha Opinion is in common language that indicates the limitations imposed by Devine's mental health concerns, not requiring the ALJ to infer those limitations from medical findings and, therefore, susceptible to interpretation by the ALJ.  The ALJ here thoroughly addressed the Gallagher/Jha Opinion and gave sufficient reasons for giving only "some weight" to the opinion.  See Section III.B, supra.

Similarly, the ALJ was qualified to review the progress notes from Devine's February 2017 surgery, which describe her status in common language indicating stability in Devine's condition and describing her functional limitations. (See, e.g., Tr. 811) ("On exam, no new findings" . . . "[Devine] has no complaints of radicular leg pain, numbness, or weakness. She does continue to

---

[10] The ALJ determined that the "additional medical evidence received . . . for review at hearing, *consistent* with medical evidence in the record justifies a conclusion that the claimant's impairments result in different limitations than concluded by the state examiners." (Tr. 22) (emphasis added).  The ALJ then added several limitations to Devine's RFC: "the claimant must be able to stretch or change positions, such as the freedom of a sit/stand option throughout her day at her discretion . . . [and] [d]ue to migraines, insomnia and psychiatric symptoms, it is reasonable to expect the claimant will be off task up to, but not in excess of 10% of each day in addition to regular breaks and absent up to one day per month." (Tr. 22-23).

experience low back/incision pain, moreso [sic] with sitting for long periods of time" . . . "[Devine] is overall doing well" . . . "She has also started doing light chores around the house, which I did encourage her to continue to do so.  We reviewed continued restrictions of no lifting, pushing, pulling greater than 10-15 pounds."). Cf. Nazario v. Health & Human Servs., Comm'r of Soc. Sec., 129 F.3d 1252, 1997 WL 693029, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision) (finding original RFC determination remained valid where post-review medical evidence, such as post-surgery progress notes, did not indicate worsening conditions).

However, new evidence of Devine's physical condition in the March 2018 MRI is raw medical data which the ALJ was not qualified to assess without an expert's review. In Bell v. Astrue, the court remanded the case where the ALJ, a lay person, discussed two MRIs post-dating the most recent expert RFC assessment.  Bell, 2012 WL 124841, at *9.  The ALJ discussed the MRI report without any accompanying notes by a doctor, describing, in part, a "L2–3 mild to moderate spinal canal narrowing due to a broad-based disc bulge and mild to moderate facet hypertrophy, moderate foraminal narrowing at L3–4 with mild to moderate spinal canal narrowing, and L4-5 mild spinal canal narrowing due to a broad-based disc bulge with mild to moderate facet hypertrophy." Id. at *9 n.4.  The court noted that this language was beyond the ken of a layperson. Id. at 9.  Similarly, here, the accompanying impression attached to Devine's March 2018 MRI "do[es] not contain any lay terminology that clearly tends to displace the materiality of the results." Giandomenico, 2017 WL 5484657, at *5 (internal quotations omitted).  The MRI impression describes "[e]nhancing granulation tissue is noted in the left hemilaminotomy defect and reaches the left L5 nerve root sleeve . . . [n]o evidence of recurrent disc herniations . . . [s]light worsening of multifactorial central spinal stenosis at L3-L4, now moderate in severity."  The ALJ is not qualified to draw conclusions from such technical language.  See Berrios Lopez v. Sec'y of Health

29

& Human Servs., 951 F.2d 427, 432 (1st Cir. 1991) (noting that an ALJ is not qualified to conclude that bare medical findings that claimant had "mild effusion into left knee with no edema and good range of motion in all joints" support a light-work capability (internal quotations omitted)); Swales v. Berryhill, 245 F. Supp. 3d 290, 295-96 (D. Mass. 2017) (same for medical language describing "no significant knee effusion," "no warmth or erythema," and "grind testing is positive").

The Commissioner argues that by adding limitations requiring that Devine have the freedom of a sit\stand option at her discretion through the workday, be off-task up to 10% of the workday, and miss up to one day of work per month because of the evidence of continued symptoms of back pain, the ALJ was merely fulfilling her duty to "piece together relevant medical facts." (Docket #19 at 18). Indeed, it appears that the ALJ pieced together Devine's hearing testimony and the February 2017 post-surgical notes, both of which allude to Devine's discomfort with sitting. (See Tr. 61, 811). However, even if this is true, it does not change the fact that the ALJ could not decide whether the record was materially changed because of the technical language in the March 2018 MRI report. The ALJ was required to obtain an expert to make that decision. See Bell, 2012 WL 124841, at *9. Remand is required to address this matter.

**D. Consideration of Devine's Subjective Complaints**

Devine argues that the ALJ erred by failing to properly consider her subjective complaints, and that this error resulted in a flawed RFC. (Docket #15 at 17-19). The ALJ found that Devine's medically determinable impairments could reasonably be expected to cause the symptoms alleged by Devine, but that Devine's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they conflicted with the RFC. (Tr. 19-20).

An ALJ makes a proper credibility determination when such a determination is "supported by substantial evidence and the ALJ . . . make[s] specific findings as to the relevant evidence he

considered in determining to disbelieve the applicant." Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986). "The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). If the ALJ finds that a claimant's allegations of disability are not credible, the ALJ must gather "detailed descriptions of claimant's daily activities, functional restrictions, medication and other treatment for pain, frequency and duration of pain, and precipitating and aggravating factors." Baez Velez v. Sec'y of Health & Human Servs., No. 92-2438, 1993 U.S. App. LEXIS. 12427, at *18-19 (1st Cir. May 27, 1993) (per curiam). Known as the "Avery factors," these descriptions must be carefully considered by the ALJ before he declares the claimant not to be credible. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 23 (1st Cir. 1986).

Devine argues that the ALJ's opinion is devoid of a review of her activities of daily living, let alone those that demonstrate a greater functional capacity than that claimed by Devine. (Docket #15 at 18). Contrary to Devine's argument, the ALJ's opinion details a number of Devine's activities of daily living including her ability to handle self-care and personal hygiene, to independently care for her three children with assistance of family, make beds and fold laundry with help from her children, prepare meals, pay bills, attend doctor appointments, take medications, watch tv, and use the internet.[11, 12] (Tr. 17-19, 21). These findings are supported by

[11] Although some of the discussion of Devine's daily activities was at step three rather than at step four of the sequential evaluation process, the ALJ was not required to rehash this evidence in order to rely on it as part of the credibility analysis. See McCartney v. Apfel, 28 Fed. Appx. 277, 279 (4th Cir. 2002) ("ALJ need only review medical evidence once in his decision"); Long v. Colvin, No. 1:13CV0659, 2015 WL 1312919, at *5 n.9 (M.D.N.C. Mar. 24, 2015 ("Where the ALJ has discussed particular evidence in one area of her decision, she need not rehash such evidence at a later point."), report and recommendation adopted, 2015 WL 1646985 (M.D.N.C. Apr. 14, 2015).

[12] Devine argues that the ALJ failed to consider the "independence, appropriateness, effectiveness and sustainability" of Devine's daily activities in accordance with 20 C.F.R. 404 Subpart P Appendix I § 12:00(F)(3)(d). (Docket #20 at

31

the record and were properly considered by the ALJ.  See Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding.").  Noting that the evidence exhibited "a generally normal level of daily activity and interaction," and that "[s]ome of the physical and mental abilities and social interactions required in order to perform these activities are the same as those necessary for obtaining and maintaining competitive employment," the ALJ supportably determined that Devine's "ability to engage in such activities is inconsistent with the subjective allegations of debilitating functional limitations."  (Tr. 21).

Devine also argues that the ALJ failed to conduct the mandated pain analysis noting that the ALJ did not mention the treatment, including the medication for pain and mental health symptoms, that she required.  (Docket #15 at 18-19).  The undersigned finds this argument without merit.

In her opinion, the ALJ highlighted inconsistencies between Devine's complaints of pain and treatment notes indicating refusal of treatment and "unremarkable" physical examinations. (Tr. 20-21).  The ALJ also cited clinical tests including a normal CT scan undermining Devine's claim of migraines several times a week, and a normal CT scan and MRI undercutting Devine's claim of grand mal seizures.  (Tr. 21).  The ALJ discussed Devine's surgical history, drawing attention to treatment notes following her February 2017 surgery where, three months post-surgery, Devine "denied numbness or weakness, and endorsed continued relief of symptoms of

9).  However, the ALJ specifically noted that Devine is only able to make beds and fold laundry with the help of her children, (Tr. 19), and that Devine was able to independently care for her children with the assistance of family, (Tr. 21).  Devine counters that one is not independently caring for children when help and assistance is provided.  (Docket #20 at 9).  The record reveals that Devine's mother helps with her three-year-old three to four times a week but that he is at home with Devine when he is not with her mother, (Tr. 46).  Hence, Devine does independently care for her children at times.

radicular leg pain." (Tr. 20). Although the ALJ did not describe Devine's medical regimen in her opinion, the ALJ did question Devine at the hearing about her medications, what they were prescribed for, dosages, length of use, and side effects. (Tr. 47-48, 56, 70-72). While detailed written discussion of the Avery factors is desirable, see Frustaglia, 829 F.2d at 195, an ALJ complies with Avery if she examines the relevant factors at the administrative hearing. See Rand v. Barnhart, 357 F. Supp. 2d 361, 368 (D. Mass. 2005) ("While it may be argued that it would have been more helpful for the hearing officer explicitly to outline the Avery factors in making his credibility determination, it is sufficiently clear from the record that he thoroughly questioned [the claimant] according to those guidelines at the hearing[.]").

The ALJ also addressed the inconsistencies between Devine's subjective complaints of anxiety and depression and the record evidence. In her opinion, the ALJ noted that despite "ongoing complaints of anxiety and depression," "mental status findings have remained benign, with no evidence of the severe deficits alleged[.]" (Tr. 21). The ALJ found that the January 2018 hospitalization was an acute event based on the absence of evidence that Devine had ever sought or received other emergency medical treatment for mental health issues. (Id.). Devine herself testified at the hearing that the behavior precipitating the hospitalization was a "one-time thing." (Tr. 67-68). The ALJ also noted the complete lack of evidence for Devine's claim made at the hearing that she has "psychotic episodes." (Tr. 21).

IV.   CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #18) be **DENIED** and Devine's Motion for

an Order Reversing the Decision of the Commissioner (Docket #14) be **ALLOWED** and the case

be remanded to the ALJ for consideration of the March 2018 MRI.[13]

<br>

/s/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[13] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).